**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PAUL RONALD LOESEL,

          CIVIL ACTION NO. 2:16-cv-13959
    *Plaintiff*,     DISTRICT JUDGE ROBERT H. CLELAND
*v.*          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 19)**

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Loesel is not disabled. Accordingly, **IT IS RECOMMENDED** that Loesel's Motion for Summary Judgment, (Doc. 16), be **DENIED**, that the Commissioner's Motion, (Doc. 19), be **GRANTED**, and that this case be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Paul Ronald Loesel's ("Loesel") claim for Disability Insurance Benefits

under Title II, 42 U.S.C. § 401 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 19).

On November 19, 2013, Loesel filed an application for DIB, alleging a disability onset date of October 30, 2010. (Tr. 137-38). The Commissioner denied his claim. (Tr. 76-92). Loesel then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on September 23, 2015 before ALJ Kendra S. Kleber. (Tr. 36-75).  The ALJ's written decision, issued November, 27, 2015, found Loesel not disabled. (Tr. 16-35). On September 8, 2016, the Appeals Council denied review, (Tr. 1-5), and Loesel filed for judicial review of that final decision on November 8, 2016. (Doc. 1).

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not

"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

###    C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two. 20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The

4

regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ found Loesel not disabled under the Act. (Tr. 31). At Step One, the ALJ found that Loesel last met the insured status requirements through December 31, 2015, and had not engaged in substantial gainful activity since October 30, 2010, his alleged onset date. (Tr. 21). At Step Two, the ALJ concluded that the following impairments qualified as severe: lumbar degenerative disc disease and obesity. (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 23-24). Thereafter, the ALJ found that Loesel had the residual functional capacity ("RFC") to perform light work, except:

> [A]t his best he can lift or carry up to 20 pounds occasionally or 10 pounds frequently. He can stand or walk up to six hours of an eight-hour workday for 30 minutes at a time. He can sit up to six hours of an eight-hour work day for 30 minutes at a time. [He] can perform work that does not involve operating foot controls with the left lower extremity. The work can frequently require climbing stairs or ramps, but not ladders or scaffolds. He can occasionally stoop or crouch, but not crawl or kneel. He can occasionally reach overhead with the right upper extremity.

(Tr. 24). At Step Four, the ALJ found Loesel incapable of performing his past relevant work. (Tr. 28-30). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Loesel can perform. (Tr. 30-31).

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has reviewed Loesel's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2.    Application Reports and Administrative Hearing

### i.    Function Report

Loesel filled out a Function Report on January 16, 2014, which appears in the administrative record. (Tr. 194-201). Describing his conditions, he wrote the following: "Can't lift heavy items, it's hard to drive; need to change sitting, standing, walking when I need to—back pain, lifting anything makes my left foot go numb, heavy items makes right foot go numb, anxiety makes it hard to get along with people. I get insecurities, depressed and anxiety." (Tr. 194). In a typical day, he would "[t]ake my daughter to carpool parking lot (4 miles), get breakfast, eat, feed cats, watch TV, go to grocery store, shower, pick up daughter, help get supper; sometimes laundry, garbage." (Tr. 195). He took care of his wife "if she needs to go somewhere," and he would "take [his] daughter to school [and] do errands." (*Id.*). He also fed his cats and cleaned their litter box. (*Id.*). "Sleeping in bed too long hurts, sleep in chair, then go back to bed." (*Id.*). He identified no areas of personal care (*i.e.* dressing, bathing, shaving, etc.) with which he encountered difficulty. (*Id.*).

Despite his impairments, Loesel continued to prepare "regular" meals every day, which took a "normal amount of time." (Tr. 196). Around the house, he would do "[s]ome laundry, rinse dishes, pick up around [the] house; house repairs if I don't need [a] ladder or have to lift." (*Id.*). He performed these activities on a daily basis. (*Id.*). Because yard work required heavier lifting, he typically did not do any. (Tr. 197). He ventured outside a

"[c]ouple times a day" and would drive his car to do so. (*Id.*). He shopped for groceries and household items "almost every day," though "sometimes" he would "feel overwhelmed in stores and it takes longer." (*Id.*). He retained the capacity to handle his finances. (*Id.*).

Loesel's hobbies included watching television, surfing the Internet, and listening to music, all of which he did daily. (Tr. 198). He used to play guitar and go to concerts, but these activities now proved difficult. (*Id.*). He also spent time with his family on the phone and online daily. (*Id.*). At times, he had trouble getting along with others because "I'm always right, I have a hard time when people are asking me questions when I've already answered the question." (Tr. 199).

Prompted to identify abilities with which Loesel's impairments interfered, he marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (*Id.*). "Lifting causes pain, numbness in feet; squatting hurts back; standing for too long [caused] pain, numbness; reaching (stretching) [caused] pain; walking for more than 10-15 minutes [resulted in] pain [and] numbness; sitting [resulted in] pain in back and hips after [half an] hour; [if he] kneel[s] [he] can't get up; stairs [caused his] foot [to go] numb; can't remember more than a few items; must write instructions down; get angry." (*Id.*). He could walk for only a few blocks before needing ten-minutes' rest, but he could pay attention "until I get bored." (*Id.*). He had trouble with both written and spoken instructions. (*Id.*). And he handled neither stress nor authority figures well. (Tr. 200).

7

In closing, Loesel noted how "[s]ometimes the pain makes me more depressed, so it's hard to do anything which makes me more depressed. Then when I finally do something; it hurts more. Then I get more depressed." (Tr. 201).

Cheryl Loesel, Loesel's wife, also filled out a Third-Party Function Report. (Tr. 168-75). The information provided therein remains consistent in all relevant respects with the information in Loesel's Function Report.

## ii.    Loesel's Testimony at the Administrative Hearing

After reviewing certain aspects of the record with Loesel's attorney, the ALJ began to question Loesel as to his impairments, beginning with a review of Loesel's past work. (Tr. 44). In 2010, Loesel was working in broadcasting, and had been doing so "for about 24 years, . . ." (*Id.*). After he stopped working, "they had me delivering vanloads and truckloads of boxes of Discover Michigan magazines which they put out all over mid Michigan. And I would have to take them to like 30 of [sic] 40 different golf courses because it was part of a package deal with . . . [a]ds. And I would have to hand deliver them. And they're like 40 pound boxes. So after I had my back surgery, they kept me on, but I would have to keep taking like half of each box out and I'd have to make twice as many trips." (Tr. 44-45). His back surgery happened in 2009. (Tr. 45). Before his back surgery, "I had like 20 different job titles or duties. I was on air. I was behind the scenes. I was doing the non-broadcasting stuff of the deliveries. I was sitting—setting up and carrying all the PA speakers and stuff and for dances that we'd have. We were also having trade shows and I was always setting up all the heavy stuff. And then after my back surgery, they tried to keep me on, but obviously, I couldn't lift anything anymore. And that's where

8

the problem came in." (Tr. 45-46). After his back surgery, his employer had him lifting up to twenty pounds, but between such lifting, the long drives, and setting up equipment on a regular basis, the attrition of his duties caused him to leave work. (Tr. 46-53). He indicated that, even without the lifting component of the job, his other duties caused too much strain. (Tr. 54).

Moving on, Loesel began to describe what exactly prevented him from returning to work. Summarizing, he said "[s]ix years post back surgery for my limp and my inability to lift anything, or twist, or carry anything. To sit any length of time other than what I'm doing right now. Standing for any length of time. I have to keep moving. I have to keep changing my position, sitting, standing, walking. And if I don't keep doing that, I get angry because I start getting in pain or I lose the feeling in my left foot which is very frustrating because I'm trying to do stuff. And then doing stuff means I'm hurting my back. And then I get angry and upset because I'm not the same guy I was that was able to work 30 years when I was able to work. And, you know, it's just a frustrating, depressing situation for me to be in." (Tr. 55). In treating his condition, he refused to take pain medication or muscle relaxers, opting instead to use medical marijuana. (Tr. 56). His pain was "constant. It always feels like I helped somebody move a few days ago. I always have that nagging soreness that drives me nuts." (Tr. 57). In a chair, the pain ranked a three or four in severity on a scale from one to ten. (*Id.*). Standing and moving around his pain could reach an eight, which frequently brought him back to his recliner. (*Id.*). He spent about half of each day in his recliner. (*Id.*). Over time, his pain has only increased. (Tr. 58).

9

At this juncture, the ALJ confronted Loesel with records from his chiropractor indicating that Loesel told him frequently "that [his] low back pain was rated a two." (Tr. 59). Loesel indicated that this discrepancy arose because he saw his chiropractor in the mornings, before he had done anything that day. (*Id.*). Activities that exacerbated his back pain included lifting things and riding in a car for longer intervals. (*Id.*). "Anything I do movement-wise aggravates it." (*Id.*). Indeed, since the onset of his conditions, he had to change the way he moves: "I went my whole life without using handrails on stairs or anything like that. Now I use handrails, I use walls. I get a little tipsy because when I put my left food down, I can't feel it and it doesn't feel like it's there and that is an issue. I can't walk without my shoes on." (Tr. 60). He confirmed, however, that he did not require any aids—such as a cane or a walker—to move about. (*Id.*).

Loesel then stood up because sitting had begun to aggravate his back pain. (Tr. 60-61). He noted that he had trouble putting weight on his left foot because "I can't feel my left foot, I can get tipsy. It looks like I'm not right." (Tr. 61). He remained able to shower, but had "to be very careful because I'm deathly afraid of falling on the wet floor of the shower because of my back. Getting dressed takes longer than it used to. Putting my shoes and socks on and tying my shoes is a real chore." (*Id.*). He could also do "light" housework, and continued to do so "because my wife's in a wheelchair, so I have to do that, but there's some things that I can't do and we have to have people come to the house and help us." (Tr. 62). He took a break every fifteen to twenty minutes for "[p]robably an equal amount" of time. (*Id.*).

10

While discussing his sleeping patterns—and his need to swap sleeping positions every three to four hours—he noted that his doctors were not sure what caused his back to crack, and his body to "relax[] and go[] flat" every time he laid down. (Tr. 63). Although he wanted to obtain another MRI and x-ray, he did not have the insurance to do so in the interval between 2009 and 2015. (Tr. 64-65).

### iii.        The VE's Testimony at the Administrative Hearing

Following Loesel's testimony, the VE classified his prior work, both pre- and post-surgery. For pre-surgery, the VE classified his job as a composite of various positions: sound mixer, disc jockey, sound technician, general clerk, and janitor. (Tr. 70). The composite qualified as medium work pre-surgery, and as light work post-surgery. (Tr. 71).

The ALJ then presented her first hypothetical, featuring an individual "able to lift or carry up to 20 pounds occasionally or 10 pounds frequently. Able to stand or walk for six hours out of eight for 30 minutes at a time. Able to sit for up to six hours out of eight for 30 minutes at a time. Able to perform work that does not involve operating of foot controls with the left lower extremity. Is frequently able to climb stairs or ramps, but not ladders or scaffolds. He is occasionally able to stoop or crouch, but not to kneel or crawl. He is occasionally able to reach overhead with the right upper extremity. . . . Would such a person be able to perform any of Mr. Loesel's past work?" (Tr. 71). The VE indicated that such an individual could not perform Loesel's past composite job, and likely none of its individual components because they "would not necessarily afford a sit/stand option which is incorporated in the hypothetical." (Tr. 71-72). Other jobs would remain available, however, such as: "a range of cashier positions"—with 280,000 national job

availabilities—"assembly positions"—with 94,000 national job availabilities—and "packaging done at a bench or a table"—with 61,000 national job availabilities. (Tr. 72). Transferable skills included "knowledge of the tools and methods of the trade," "[w]ritten and oral communication skills from the general clerk position," "records management," and "basic computer skills" and "data entry." (Tr. 73). Nevertheless, these transferable skills would not make any of his prior work possible for him. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner,

12

such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or

13

equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

14

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

15

> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

Loesel furnishes two arguments in his memorandum: (1) the ALJ's refusal to incorporate mentally-based limitations in his RFC deprives it of the support of substantial evidence; and (2) the ALJ rendered a fatally defective analysis of Loesel's right-shoulder impairment. I discuss each in turn.

### 1.    Mentally-Based Limitations

16

Loesel first argues that the ALJ should have considered more seriously the evidence of his depression and anxiety in the record, and in particular, her consideration and discussion of Loesel's failure to seek treatment despite not having health insurance until November 2014. In her opinion, the ALJ noted, among other things, that "[t]here is no record evidence that [Loesel] underwent a course of mental health therapy or counseling." (Doc. 16 at ID 419). To this, Loesel responds that although he never had "formal mental health therapy or counseling, he *did* treat with his primary care doctor for depression, as noted by the fact that he was taking Prozac in the first place." (Doc. 16 at ID 419-20). He observes, as well, that the record repeatedly shows diagnoses of depression. (Doc. 16 at ID 420). In his estimation, the ALJ failed to adequately account for his lack of insurance prior to November 2014, which contravenes Sixth Circuit precedent dictating that "when a claimant cannot afford prescribed treatment or medication, his or her disability must be judged without the relief they could have provided." (*Id.*).

This argument neglects the ALJ's discussion as it pertains to records post-dating his acquisition of health insurance, which support of her reasoning. She noted, for instance, that Loesel never heeded instructions from Dr. Pestrue, his treating physician, to seek treatment for possible attention-deficit disorder in June 2015. (Tr. 23, 299). Nor did he pursue a "course of therapy, counseling or other specialized mental health treatment" after obtaining insurance, as evidenced by his "fairly limited, routine and conservative" treatment from Dr. Pestrue. (Tr. 25); *see* (Tr. 236, 246, 266, 281, 287, 291, 322, 327, 332) (noting Prozac's effectiveness in controlling Loesel's mental-health symptoms). Despite his assertions to the contrary, Loesel likewise indicated that he found medical marijuana

helpful in controlling symptoms from his mental impairments. (Tr. 25, 79-80). And the ALJ also explained that Loesel did not seek "emergency room treatment or other urgent treatment" during his uninsured time, which one might expect from an individual with the symptoms Loesel alleged. (Tr. 61). These citations find validation at other points in the record as well. *E.g.*, (Tr. 232, 236, 242, 248-49, 257, 263, 266, 272, 282, 288, 291-93, 323, 329, 334, 339) (conveying a normal mood and affect despite diagnoses of depression or anxiety); (Tr. 287, 291) (denying anxiety and other mental symptoms); (Tr. 307, 315) (relaying an ability to concentrate without interruption).

Loesel contends that weighing his failure to seek treatment against him constitutes reversible error under *MicKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990). In *McKnight*, the Sixth Circuit held that "[t]he Secretary must determine whether McKnight's conditions are disabling, within the meaning of the regulations, in the absence of treatment," and that if a claimant "is found to have a disabling impairment," "without regard to treatment," "then the Secretary must determine if there is an affordable" and "available" treatment "that would prevent the disability from being a severe impairment under the statute and regulations." *Id.* at 242. The court clarified in *Strong v. Social Security Administration*, 88 F. App'x 841, 846 (6th Cir. 2004), however, that "[t]he issue of poverty as legal justification for failure to obtain treatment does not arise unless a claimant is found to be under a disabling condition." According to the Sixth Circuit's rationale in *Strong*, "[i]n the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment," and a "failure to do so may cast doubt on a claimant's assertions of disabling pain." *Id.* at 846.

18

These cases do not undermine the ALJ's opinion at issue. Quite the contrary—the ALJ here merely considered the lack of contemporaneous evidence of Loesel's symptoms while uninsured as one factor among many, and recognized that Loesel's conservative treatment continued even after he became insured. Such considerations remain entirely appropriate under *McKnight* and *Strong*.

In similar fashion, Loesel takes issue with the ALJ's consideration of his social functioning, as well as his concentration, persistence, or pace. (Doc. 420-22). With respect to social functioning, Loesel attacks the ALJ's reliance "solely upon a function report, without considering the opinions of the State agency psychological consultant who found 'that plaintiff would function best in a position that did not require that he relate to the public. . . .'" (Doc. 16 at ID 420) (quoting (Tr. 85)). And with respect to concentration, persistence, or pace, Loesel suggests that the ALJ ignored critical evidence, including his "years of treatment for depression," Dr. Pestrue's diagnoses of "major depression and adjustment disorder with anxiety," and Dr. Starrett's opinion that he was "moderately limited" in concentration, persistence, or pace. (Doc. 16 at ID 422).

When subjected to scrutiny, however, the record buttresses the ALJ's findings. As to social functioning, Loesel's concern that the ALJ failed to consider Dr. Starrett's statement that he "would function best in a position that did not require that he relate to the public" seems unlikely, (Tr. 85), as Dr. Starrett's evaluation *also* found Loesel to have only mild difficulties in maintaining social functioning, (Tr. 80-81). Indeed, the ALJ's later discussion of Dr. Starrett's opinion—which she accorded "mixed weight"—shows that she endorsed his finding of mild social limitation. (Tr. 28). And in like manner, the ALJ

discounted Dr. Starrett's finding of moderate limitation as to concentration, persistence, or pace, based on the absence of longitudinal medical evidence corroborating such a finding. (*Id.*) ("The mental limitations were given little weight. They appear based on the result of the one consultative exam and fail to account for [Loesel's] lack of mental health treatment, which indicates these impairments are mild at best."); (Tr. 307, 315) (showing Loesel had little difficulty concentrating). Though she granted "some weight" to Dr. Pestrue's observation that Loesel was "'moderately depressed,'" she recognized that there was "no evidence from Dr. Pestrue's examination of [Loesel] that his mental impairments are anything other than mild . . . ." (Tr. 28 (quoting (Tr. 249)). Indeed, Dr. Pestrue's examination described Loesel as "friendly and cooperative," a "good historian," able to utilize rational thought and abstract thinking, and capable of crunching backward serial sevens with "moderate" speed and routine calculations with "moderately fast" speed. (Tr. 249-50). The ALJ thoughtfully weighed this evidence, and was entitled to conclude that Dr. Pestrue's opinion evidenced mild rather than moderate limitations. The ALJ's findings on this front—coupled with the ALJ's earlier discussion of Loesel's infrequent, conservative treatment for mental health, (Tr. 23-25), as addressed above—militate against remand.

In his argument's final iteration, Loesel suggests that the ALJ's failure to find any severe mental impairment at Step Two signifies error because she never actually considered his nonsevere mental impairments in determining his RFC. (Doc. 16 at ID 422-23). This suggestion represents a culmination of those addressed above, and should fail for similar reasons. As already discussed at some length, the ALJ plainly *did* consider the

20

opinion evidence Loesel supposes she ignored—and the nonsevere impairments on which they opined—making any failure to find his mental impairments severe at Step Two "legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("Anthony . . . cleared step two of the analysis. This caused the ALJ to consider Anthony's severe and nonsevere impairments in the remaining steps of the sequential analysis. The fact that some of Anthony's impairments were not deemed to be severe at step two is therefore legally irrelevant.").

In sum, Loesel cannot demonstrate that the ALJ's well-reasoned opinion lacks the support of substantial evidence on these grounds, and the Court should reject his arguments to the contrary.

### 2.   Right Shoulder Impairment

Loesel next posits that the ALJ should have considered his right-shoulder problems severe. He identifies the ALJ's statement that "[t]here is no diagnoses [sic] from an acceptable medical source of any particular problem, nor is there imaging of his shoulder showing a defect," (Tr. 22), and notes that in fact Dr. Johnson diagnosed him with right shoulder tendinitis, (Doc. 16) (citing (Tr. 257)). Further, although the ALJ incorporated a limitation on overhead reaching in her RFC assessment, Loesel avers that the limitation "should have addressed more than merely overhead movement." (Doc. 16 at ID 425). Neither point Loesel makes is persuasive. Aside from Dr. Johnson's notation, Loesel cites no other evidence in support of his alleged right-shoulder impairment, and Dr. Johnson ostensibly based his diagnosis on Loesel's own statements. (Tr. 256) ("The patient has been getting pain at the right shoulder. He cannot get his right arm overhead. His doctor told

him he had tendonitis."). This alone cannot substantiate Loesel's right shoulder impairment, and no other medical source of record renders a like diagnosis. *See* SSR 96-4p, 1996 WL 374187, at *1 (S.S.A. July 2, 1996) ("[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 498 (6th Cir. 2006) ("A subjective allegation of disabling symptoms alone is insufficient; the claimant must substantiate the symptoms by objective clinical or lab findings."). The ALJ nevertheless gave some credence to Loesel's allegations of shoulder pain, (Tr. 25), and provided a limitation in her RFC therefor, (Tr. 24) ("He can occasionally reach overhead with the right upper extremity."). That Loesel fails to provide supporting citation to his contention that the limitation should be more severe waives any further argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)).

For these reasons, the ALJ adequately considered and discussed Loesel's nonsevere right-shoulder impairment, and Loesel cannot demonstrate a need for remand on this basis.

### H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Loesel's Motion for Summary Judgment, (Doc. 16), be **DENIED**, that the Commissioner's Motion, (Doc. 19), be **GRANTED**, and that this case be **AFFIRMED**.

III. __REVIEW__

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 31, 2017                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: August 31, 2017                    By s/Kristen Castaneda
                                         Case Manager